IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


KEITH L. SIGLER, *et al.*,                    :

    Plaintiffs,                    :
                                        Case No. 3:07cv092

          vs.                    :
                                          JUDGE WALTER HERBERT RICE

CITY OF ENGLEWOOD, OHIO,                    :
*et al.*,
                                     :

    Defendants.


---

DECISION AND ENTRY SUSTAINING, IN PART, AND OVERRULING,
IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC.
#59) AND OVERRULING, IN PART, AND OVERRULING, AS MOOT, IN
PART, DEFENDANTS' MOTION TO STRIKE EXHIBITS (DOC. #71);
CONFERENCE CALL SET

---

Keith Sigler was commissioned as a police officer with Defendant City of

Englewood's Police Department, in May of 1988, and continued in that

employment until March 21, 2006, at which time the City terminated him. Doc. #1

¶ 15.  Plaintiffs Keith L. Sigler and Susan Sigler, husband and wife, initiated this

action against Englewood and seven of its employees, setting forth seven claims

arising from the circumstances surrounding that termination.  Id.  After the Plaintiffs

had voluntarily dismissed several of their claims and the Court had ruled on the

Defendants' Motion for Judgment on the Pleadings, only five Defendants[1] and

---

[1]The five remaining Defendants are the City of Englewood, Eric A. Smith
(Englewood City Manager), Mark Brownfield (Englewood Chief of Police), David
Pelkey (Englewood Police Sergeant) and Eric Totel (Englewood Police Officer). Doc.

three causes of action remain, to wit: Keith Sigler's claim for First Amendment retaliation against Defendants Englewood, Smith and Brownfield (Count I); both Plaintiffs' claims for intentional infliction of emotional distress against Defendants Smith, Brownfield, Pelkey and Totel (Count IV); and Keith Sigler's disability discrimination claim against Defendants Englewood, Smith, Brownfield and Pelkey (Count VI). Doc. #40. Presently before the Court is the Defendants' Motion for Summary Judgment, as to the remaining claims (Doc. #59), as well as the Defendants' Motion to Strike Exhibits to Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (Doc. #71).

At the outset, the Court will address the Defendants' Motion to Strike Exhibits and then will turn to a review of the pertinent facts, in this case. The Court will conclude with a consideration of the Defendants' Motion for Summary Judgment.


I.    Motion to Strike Exhibits

The Defendants have moved the Court to strike certain documents filed by the Plaintiffs, in support of their memorandum in opposition to the Defendants' Motion for Summary Judgment. Doc. #71. Specifically, the Defendants ask the Court to strike all, or portions of, five affidavits, along with various attachments to those affidavits, that the Plaintiffs cite in their Memorandum in Opposition. Doc.

_____

#1 at 1-2.

2

#63.

Both parties to this case have set forth and argued many facts that are not relevant, or simply not essential, to the resolution of the issues that are presently before the Court. Because, with two exceptions, the Court did not rely on the evidence challenged by the Defendants, in their Motion to Strike, it finds it unnecessary to respond to the Defendants' Motion regarding the same. The Court will, however, address the narrow part of the Motion that challenges the propriety of the two documents upon which the Court did rely, Keith Sigler's performance reviews from 2004 and 2005.

The two performance evaluations are attached, along with other documents, to Kimberly A. Rutowski's affidavit, as Exhibit D to Document #67. Ms. Rutowski is counsel for the Plaintiffs. In attempting to authenticate these documents, Ms. Rutowski avers as follows: "Attached hereto as Exhibit 'D' is a true and accurate copy of Documents provided by Defendants in Response to Request for Production of Documents and Public Record Request." Doc. #67 ¶ 5.

In arguing that the documents attached to the affidavit as Exhibit D should be stricken, the Defendants contend that "[n]one of the documents attached to this affidavit are properly authenticated and further, the documents are hearsay." Doc. #71 at 8. The Defendants go on to suggest that "this seems to be another example of the Plaintiffs not bothering to authenticate any of these documents during discovery . . . ." <u>Id.</u>

The "general provision" of Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). That Rule goes on to provide, by way of illustration, that "[t]estimony that a matter is what it is claimed to be" may be used as a means to authenticate evidence. Fed R. Evid. 902(b)(1).

In accordance with Rule 901, Ms. Rutowski has provided testimony that the documents attached as Exhibit D were provided to her by the Defendants, in response to a request for the production of documents and a public record request. She is, without a doubt, competent to testify to the same and, thus, to authenticate the documents, in this manner.[2]

Having found that the documents attached as Exhibit D to the Rutowski affidavit (Doc. #67) are what the Plaintiffs purport them to be, the Court OVERRULES the Defendants' Motion to Strike Exhibits (Doc. #71), as it pertains to these documents, and OVERRULES the same, as moot, as to all other challenged

---

[2]The Court hopes that the Defendants are not questioning whether the documents are true and accurate copies of Keith Sigler's original performance evaluations, since the Defendants presented these very documents to the Plaintiffs, in response to the Plaintiffs' request for the same. If this is the case, Defendants' counsel must inform the Court whether it intends to challenge the same at trial, in which case the Court will schedule a deposition of Defendants' counsel to explain why the Defendants submitted unauthentic documents to Plaintiffs during discovery.

evidence.

II.    <u>Facts</u>[3]

    A.    <u>Keith Sigler's Work Performance</u>

Keith Sigler's 2004 performance evaluation stated, "Officer Sigler is respected by his peers and supervisors.  He has been the day watch acting supervisor during the rating period and has assisted the City's Zoning Department throughout the year with difficult cases." Doc. # 67-5 at 2.  On that same evaluation report, Sigler received a rating of "excellent" (the top out of four possible ratings) in six of the eight rating categories and a rating of "proficient" (the second out of four possible ratings) in the other two categories. <u>Id.</u> at 1.  In November 2005, Sigler's employment evaluation described him as a "good seasoned police officer with excellent technical skills," while assigning him four "excellent" ratings and four "proficient" ratings. <u>Id.</u> at 3-4.

On February 1, 2006, Sigler received a record of disciplinary action, because he had inappropriately accused an administrative assistant of mishandling departmental gift fund monies. Doc. #32-2 (K. Sigler Dep.) at 211-12; Doc. #59-4 (Pelkey Dec.) ¶ 7.  The next month, Englewood terminated Sigler for reasons that

_____

[3]Since this case comes before the Court on the Defendants' Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to such Motion in the manner most favorable to the Plaintiffs, as the parties against whom the Motion is directed. <u>Servo Kinetics, Inc. v. Tokyo Precision Instruments</u>, 475 F.3d 783, 790 (6th Cir. 2007).

will be identified below.

B.   Susan Sigler's Letter

On February 7, 2006, Susan Sigler wrote a letter captioned "Citizens Awareness for Public Servants (CAPS)[4]" ("CAPS letter")  and mailed it anonymously to thirty people. Doc. #33 at 196-97.  Although lengthy, the Court will set forth the contents of this letter, in full, given the letter's relative importance to the issues presently before the Court.

Citizen awareness for public servants (CAPS)

Dear Englewood citizen,

This letter is to bring an injustice to your attention.  Just a little over a year ago, Englewood police chief Mark Brownfield married Englewood officer Julie Parks.  The armed services and corporate America have long held fraternization policies to protect the workplace from such relationships.  The Marines have always had a no tolerance policy for fraternization.  In 1999, the Air Force adopted a no tolerance policy for fraternization, and due to the detrimental effects on unit morale, they opted to NOT grandfather existing relationships.  In 2004, the aircraft maker Boeing fired its CEO for having an intimate relationship with a subordinate.  The city of Englewood did adopt a no fraternization policy after the marriage of the Chief to a subordinate, but the damaging effects are affecting our dedicated police officers and dispatchers.

In the last year, employee turnover is at an all time high.  For the first time in city history, the dispatchers have joined an employee union.  Typically, happy employees do not elect to become unionized.

---

[4]There was no such group as the "Citizens Awareness for Public Servants." Doc. #33 (S. Sigler Dep.) at 194.  Susan Sigler contrived this name for purposes of the subject letter. Id.

Employees who have had to tolerate discrimination and unfair labor practices are the ones that usually elect to join a union.

The latest edition of the Englewood newsletter did not mention that the Englewood police department is no longer accredited. Most neighboring cities our size have proudly achieved accreditation. Accreditation lowers the cost of liability insurance and is proof that policies and procedures are being followed. Accreditation is achieved by a group of fellow police chiefs coming in and making sure that the department is following good practices.

Recently, the Englewood Independent ran a front page story that Walmart had donated $2,000 to the Englewood Police Department for children's programs. With the cancellation of DARE and Safetytown, where is that money going?

After building a multi million dollar police department and dispatch center, Englewood has lost two dispatching contracts to the sheriff's department.

Please share this information with your friends and neighbors, and take a moment to ask your city council why we are tolerating this injustice.

Doc. #22-2 at 117.[5] Susan Sigler first showed this letter to her husband soon after she mailed it. Doc. #32 (K. Sigler Dep.) at 180-86. Keith Sigler did not inform anyone in the police department about the letter, although word about it soon got back to the department, through other means. Doc. #59, Ex. C (Pelkey Dec.) ¶¶ 3, 8.

Upon learning about the CAPS letter, an officer in the police department questioned Keith Sigler as to whether he had previously seen it. There is a

_____

[5]Englewood disputes the veracity of most of the allegations contained in this letter. The Court finds it unnecessary to decide whether the letter is accurate, however, in order to resolve the issues before it.

disagreement between the parties as to how Sigler responded to this question, with the officer in question claiming that Sigler said he had not yet seen the letter, while Sigler asserts that he merely asked for a copy of the letter, without explaining why he needed it, "thereby giving rise to an inference that he needed it because he had not seen it." Doc. #22-2 (Arbitrator's Rpt.) at 97.[6]

C.    Keith Sigler's Termination

Englewood terminated Keith Sigler, on March 21, 2006. Doc. #59-2 at 3. The Defendants characterize the reason for his termination as follows: "Plaintiff Keith Sigler was terminated for his failure to notify Englewood of [Susan Sigler's CAPS letter] and for being untruthful during the internal investigation surrounding the anonymous letter, which happened to be authored by his wife."[7] Doc. #59 at

---

[6]After hearing the evidence pertinent to the grievance, in this case, and interpreting that evidence in the light most favorable to Sigler, the labor arbitrator concluded that Sigler did not state that he had not yet seen the CAPS letter, but "rather merely requested a copy of [the letter] for reasons not articulated at that time." Doc. #22-2 (Arbitrator's Rpt.) at 97.

[7] More specifically, the reasons given for his discharge, in the Record of Disciplinary Action, are as follows:

[An investigation] was completed pertaining to the mailing of a handbill and other correspondence which was critical of decisions made by the City of Englewood Administration and which was intended to discredit or embarrass the police department and/or sworn officers.  This investigation revealed that you (1) on 2/14/06 falsely denied having yet seen the handbill; (2) while on duty openly discussed the content of the handbill with other Englewood police officers prior to the date the handbill was mailed; (3) had knowledge of who was responsible for developing and mailing the handbill; (4)

2.  The Record of Disciplinary Action for Sigler's termination cites certain sections

of the Englewood Police Department General Orders and the City of Englewood

Rules of Merit Employment, which Sigler allegedly violated by the aforementioned

conduct.  The applicable portion of the General Orders reads as follows:

> I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. . . .
>
> I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions. . . .
>
> I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. . . .

Id. (quoting Doc. #59-3 at 9).  With regard to the Rules of Merit Employment, the

implicated provisions read as follows:

> EMPLOYEES MUST PERFORM THEIR DUTIES IN A MANNER WHICH EARNS AND MAINTAINS THE TRUST AND RESPECT OF THEIR SUPERVISORS, OTHER EMPLOYEES AND THE PUBLIC.
>
> EMPLOYEES MUST COOPERATE AND WORK WELL WITH OTHER EMPLOYEES AND THE PUBLIC.

---

had knowledge of who was also responsible for forwarding personal information to the Clark County Sheriff's Office which discredited and embarrassed a co-worker; and (5) did not feel a duty to report that the correspondence containing inflammatory information regarding your employer was going to be mailed and circulated and, thereby, you were a participant.  These actions represent a breach of duty, an offense against the City of Englewood, and having been previously warned for similar conduct, these actions are cause and grounds for removal.

Doc. #59-2 at 3-4.

EMPLOYEES MUST BE CHARACTERIZED BY HIGH PERSONAL INTEGRITY, BOTH IN SECURING EMPLOYMENT AND IN THE PERFORMANCE OF THEIR DUTIES.  Violation of this standard would include actions such as: . . .  Deliberately withholding information, or providing untruthful information, related to work from supervisors or others requiring the information.

Id. (quoting Doc. #59-2 at 24, 26, 28) (all caps in original).

III.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).  "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical

10

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex, 477 U.S. at 324.  "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." Mich. Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).  In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

IV.    Analysis of Defendants' Motion for Summary Judgment

At the outset, the Court notes that the Plaintiffs do not oppose the Defendants' Motion for Summary Judgment, as to the claim for disability discrimination. Doc. #63 at 14.  Thus, the Defendants' Motion for Summary Judgment (Doc. #59) is SUSTAINED, as to the claim for disability discrimination (Count VI).  The Court will now consider the merits of the Plaintiffs' two remaining

12

claims, First Amendment retaliation and intentional infliction of emotional distress.

A.     First Amendment Retaliation (Count I)

The Defendants' argument, as to Keith Sigler's First Amendment retaliation claim, is three-fold.  They initially argue that the Plaintiff has not set forth sufficient evidence to satisfy a *prima facie* case of First Amendment retaliation. Alternatively, they argue that, even if Sigler has satisfied his *prima facie* case, they are entitled to qualified immunity for this claim.  Finally, they argue that the governing collective bargaining agreement ("CBA") requires that Keith Sigler arbitrate this claim and, because he did not do so, he is barred from presenting the claim here.  The Court will analyze each argument, in turn.

1.     Plaintiffs' *Prima Facie* Case

Keith Sigler asserts that he was terminated in retaliation for his association/ relationship with his wife.  In support of this argument, Sigler cites two cases from the Sixth Circuit that purportedly establish that he had a constitutional right to associate in an intimate relationship, which the Defendants violated by terminating him.

Before turning to the two cases cited by the Plaintiff, the Court first looks to the basic requirements for bringing a claim of First Amendment retaliation.  The Sixth Circuit instructs that a plaintiff alleging retaliation for the exercise of a

constitutional right must show that:

> (1) the plaintiff engaged in protected conduct;
>
> (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and
>
> (3) there is a causal connection between elements one and two--that is, the adverse action was motivated at least in part by the plaintiff's protected conduct

Lockett v. Suardini, 526 F.3d 866, 874 (6th Cir. 2008) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

The Defendants, in the present case, assert that Sigler did not participate in any protected conduct. They contend that he was terminated for his failure to notify Englewood of Susan Sigler's anonymous letter and for being untruthful during the internal investigation surrounding that letter, rather than because he was married to Susan Sigler.[8] The Defendants also argue that the right of intimate association is violated only when there is an "undue interference" with a protected relationship, and the record in this case establishes that the Defendants' rules, under which Sigler was terminated, "did not [have] any impact on the Siglers' marriage[] or cause any undue intrusion into the Plaintiffs' marriage." Doc. #59 at 21. Finally, the Defendants state that the Plaintiff has not established a causal connection between his marriage and his termination. Doc. #70 at 13.

---

[8]The Defendants go on to suggest that "the record proves" and "the Plaintiffs cannot dispute" that "Keith Sigler would have been terminated regardless of who had written the letters." Doc. #59 at 20. This, of course, is mere supposition.

14

Courts have recognized that individuals have a constitutionally protected right to two types of association: "(1) freedom of expressive association, protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment." Anderson v. City of Lavergnem, 371 F.3d 879, 881-82 (6th Cir. 2004) (citing, among other, Roberts v. United States Jaycees, 468 U.S. 609, 617-18, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984)).

> With respect to expressive association, the Supreme Court "has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion." Concerning intimate association, the Supreme Court "has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme."

Id. (quoting Roberts, 468 U.S. at 617-18). In the present case, Keith Sigler asserts that the Defendants interfered with his relationship with his wife, in violation of his right of intimate association.

In the two cases cited by the Plaintiff, the Sixth Circuit addressed whether the plaintiffs had established a *prima facie* case of First Amendment retaliation, with regard to their terminations, which were, at least in part associated with their spouses' conduct. In Adkins v. Board of Education, the plaintiff was allegedly discharged in retaliation for her association with her husband, who was the

principal of the high school where she was employed (and who refused to succumb to pressure from the superintendent to falsify documents, yet could not be fired).[9] Adkins, 982 F.2d 952 (6th Cir. 1993). In finding that the plaintiff had established a *prima facie* case of First Amendment retaliation, the Appellate Court determined that it was "not necessary that the governmental act require the abandonment or dissolution of a marriage relationship as the price for retaining public employment"; rather, the right of intimate association is violated "if the action constitutes an 'undue intrusion' by the state into the marriage relationship." Id. at 956 (citing Roberts, 468 U.S. at 618-19).

Similarly, in Sowards v. Loudon County, the plaintiff alleged that her employer (the county sheriff) terminated her, because her husband unsuccessfully ran against the sheriff for his office. Sowards, 203 F.3d 426 (6th Cir. 2000). In concluding that the plaintiff, in Sowards, had established that she was engaged in the protected conduct of intimate association under the First Amendment, the Court pointed only to facts that suggested that her employer "dismissed her because of her protected relationship with her husband, which could constitute an undue interference in that relationship." Id. at 433 (citing Adkins, 982 F.2d at 956).

With regard to the Plaintiffs' *prima facie* case, in the present litigation, the facts are indistinguishable from those in Adkins and Sowards, in pertinent part.

---

[9]According to the Adkins plaintiff, the superintendent stated, "I can't get rid of [your husband], and you're the next best thing." Adkins, 982 F.2d at 954.

The Defendants attempt to distinguish those cases by arguing that they contained facts "as to the motivation for the adverse employment actions taken against those plaintiffs, including statements by the employers that the employees' marriages played a role in the employer's decision." Doc. #70 at 12. The Court disagrees with the Defendants' characterization of those decisions. The plaintiffs, in <u>Adkins</u> and <u>Sowards</u>, were not allegedly terminated because of <u>their marriages</u>, per se, but rather, because of <u>their spouses' conduct</u>, which is what the Sixth Circuit found objectionable in constituting an undue interference in the marital relationship.

Comparing that observation to the present case, the Court concludes that the City also terminated Keith Sigler because of his wife's conduct in writing the CAPS letter. The Defendants attempt to turn the focus away from Susan Sigler's conduct by arguing, instead, that it was Keith Sigler's failure to apprise the City of Susan's conduct, as mandated by City regulations, that caused his termination. On this point, the Court makes two conclusions. First, that the regulations to which the City points in support of their argument that Keith Sigler was required to report his knowledge of the CAPS letter (as set forth in the facts above), do not mandate such conduct, much less indicate that he will be fired for failing to do so. (Even if the regulations did require such, if such a mandate impinged on an employee's right to intimate association (such as is arguably the case here), it would be unconstitutional.) Also, whether the City fired Sigler because his wife wrote the CAPS letter, or because Keith Sigler failed to inform the City that Susan had written the letter, is a distinction without a difference. Keith Sigler testifies

17

that he did not see the letter until after Susan had sent it out, so it is hard to imagine how the City would have been in a better position if it had learned about the letter from Sigler rather than from its actual source of information.

In sum, therefore, the Plaintiff has set forth sufficient evidence to create a genuine issue of material fact as to whether the City's termination of Keith Sigler constituted an undue intrusion into his marriage with Susan Sigler, either because the City terminated him for failing to report his knowledge of the CAPS letter that Susan authored (as the City contends) and/or simply because Susan, his wife, wrote the same.

The Defendants also contend that the City terminated Keith Sigler, in part, because he lied when his supervisor questioned him about his knowledge of the CAPS letter.[10]  As noted above, there is a genuine issue of material fact as to whether Keith Sigler lied when he was so questioned. Doc. #22-2 (Arbitrator's Rpt.) at 97.  Even if a jury were to conclude that Sigler lied, however, there is a question of fact as to whether this alleged wrongdoing motivated the City's decision to terminate him, in whole or in part, vis-a-vis his failure to report the letter and/or Susan's authorship of the letter, as just discussed.

Because there is a genuine issue of material fact as to whether Keith Sigler

---

[10]Given the arbitrator's conclusion on this point, as noted above, the Court finds somewhat troubling the Defendants' zealousness in asserting that "[t]he undisputed fact is that Plaintiff Keith Sigler lied about his knowledge of the CAPS letter during the internal investigation.  That is the only material fact in this motion, and the Plaintiffs do nothing to dispute this fact." Doc. #70 at 6.

has established the elements of his *prima facie* case of First Amendment retaliation, the Defendants are not entitled to summary judgment, absent success under some other legal theory.

2.    Qualified Immunity

The Defendants contend that they are entitled to summary judgment, even if the Court determines that the Plaintiff has established a *prima facie* case of First Amendment retaliation, because they have qualified immunity from this claim. The Supreme Court explains that the doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Id. (quoting Groh v. Ramirez, 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (Kennedy, J., dissenting)). To overcome the Defendants' claim of qualified immunity, the Plaintiffs must show that (1) the City violated Keith Sigler's constitutional rights, and (2) the constitutional rights at issue were clearly

established.  If the Plaintiffs fail on either prong, the Defendants are entitled to qualified immunity. <u>Weinberger v. Grimes</u>, 2009 U.S. App. LEXIS 2693, *9 (6th Cir. 2009) (citing <u>Pearson</u>, 129 S. Ct. 808); <u>see also</u> <u>Pearson</u>, 129 S. Ct. at 818 (concluding that qualified immunity sequence previously required by <u>Saucier v. Katz</u>, 533 U.S. 194 (2001)[11] is no longer mandatory; rather, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"); <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) (requiring that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized [less general], and hence more relevant, sense").

The Supreme Court has recognized the right to freedom of intimate associations since 1984. <u>Board of Dir. of Rotary Intn. v. Rotary Club of Duarte</u>, 481 U.S. 537, 95 L. Ed. 2d 474, 107 S. Ct. 1940 (1987); <u>Roberts v. United</u>

---

[11]As explained by the <u>Pearson</u> Court, the sequence previously mandated by <u>Saucier</u>, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272, for resolving government officials' qualified immunity claims, was as follows:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right.  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

<u>Pearson</u>, 129 S. Ct. at 815-16 (2009) (citations omitted).  As noted above, in <u>Pearson</u>, the Court modified this approach by allowing judges to exercise their discretion in determining which of the two prongs to analyze first. <u>Id.</u> at 818.

States Jaycees, 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984).

Furthermore, the Sixth Circuit has previously interpreted that right to cover factual

situations such as the present one. Sowards, 203 F.3d at 438-39 (discounting

defendant's qualified immunity contentions); Adkins, 982 F.2d at 956 (same).

Because there is a genuine issue of material fact as to whether the City violated

Keith Sigler's constitutional rights, as discussed above, and given that the

constitutional rights at issue are clearly established, the Defendants are not entitled

to summary judgment, with regard to their qualified immunity argument.


      3.    <u>Arbitration Requirement</u>

The Defendants next argue that Sigler's union waived his right to assert his

claim in a judicial form, by means of the mandatory arbitration language in the

CBA. In support of their argument, the Defendants submit that "Article III [of the

CBA] clearly states that the parties to the CBA have agreed to follow all applicable

antidiscrimination laws." Doc. #59 at 31-32. The provision to which this argument

applies provides that "Management, the Union and each employee covered herein

will cooperate with all applicable laws forbidding discrimination on account of race,

color, creed, religion, sex, national origin, handicap, age, political affiliation,

membership status or non-membership in the union." Doc. #22-3, Art. III, § 1.

Other terms of the CBA, which are possibly relevant to the argument made by the

Defendants, are as follows:

From ARTICLE VIII (Discipline and Dismissal Procedure): Disciplinary actions may only be appealed by the employee through the provisions of the Grievance Arbitration Procedure set forth in this Agreement.

From ARTICLE XV (Grievance Procedure): A grievance, under this Agreement is a written dispute, claim or complaint arising under or during the term of this Agreement . . . . Grievances are limited to matters of interpretation or application of express provisions of this Agreement, including wages, benefits and working conditions. No matter may be filed or processed as a grievance hereunder if such matter may be made a complaint with any Federal or State Agency.

From ARTICLE XVI (Arbitration): The decision of the arbitrator shall be final and binding on the Union, bargaining unit employees, and the City except as may otherwise be appealed pursuant to the provisions of O.R.C. Chapter 2711.

Id. at 9, 12, 13.

In response, the Plaintiffs assert, in essence, that the terms of the CBA are not sufficiently clear to constitute a waiver of Sigler's right to proceed judicially, and also that they should not be denied the opportunity to object to the arbitration award since they could not file an appeal to the same. Because the Court agrees with the Plaintiffs' first argument, as explained forthwith, it finds it unnecessary to address their second argument.

The Supreme Court recently resolved the question of whether a union may waive a covered employee's right to a judicial forum for resolution of certain federal statutory claims, which had been left open by earlier Supreme Court decisions. E.g., Wright v. Universal Mar. Serv. Corp., 525 U.S. 70, 82, 119 S. Ct. 391 (1998) (holding that collective-bargaining agreement did not contain "clear and unmistakable waiver of the covered employees' rights to a judicial forum" and,

22

thus, "[did] not reach the question [of] whether such a waiver would be enforceable").  In 14 Penn Plaza LLC v. Pyett, 129 S. Ct. 1456, 1466, 173 L. Ed. 2d 398 (2009), the Supreme Court held that a union may bind a covered employee to arbitration, as long as the statute in question (the ADEA, in that case) does not preclude arbitration and the arbitration clause in question "clearly and unmistakably" requires such arbitration.  Although 14 Penn Plaza clarified and corrected some of the anti-arbitration dicta in its predecessor cases, e.g. id. at 1471 (noting that it had previously "mistakenly suggested that certain features of arbitration made it a forum 'well suited to the resolution of contractual disputes,' but 'a comparatively inappropriate forum for the final resolution of rights created by Title VII'") (citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 56, 94 S. Ct. 1011 (1974)), it did not contradict the holdings of the same. 14 Penn Plaza, 129 S. Ct. at 1469 n.8.

Based on this Supreme Court guidance, this Court's first task is to review the terms of the CBA to determine if that document "clearly and unmistakably" requires arbitration of Sigler's First Amendment retaliation claim.  In arguing that it does not, the Plaintiffs point to an earlier Supreme Court decision, with similar facts, Wright v. Universal Maritime Service Corporation, 525 U.S. 70, 119 S. Ct. 391 (1998).

In Wright, the question presented was whether an employee's claim for disability discrimination, under the Americans with Disabilities Act, was subject to

23

a presumption of arbitrability. Wright, 525 U.S. at 70. The pertinent language in the collective bargaining agreement included a direction that "[m]atters under dispute" be grieved and if such matters were not resolved by the grievance committee, then they must be turned over to an arbitrator. Id. at 72. The agreement went on to note that it "cover[ed] all matters affecting wages, hours, and other terms and conditions of employment" and that "[i]t is the intention and purpose of all parties hereto that no provision or part of this Agreement shall be violative of any Federal or State Law." Id. at 73. A related agreement provided that "[a]ny dispute concerning or arising out of the terms and/or conditions of this Agreement, or dispute involving the interpretation or application of this Agreement, or dispute arising out of any rule adopted for its implementation," shall be subject to the grievance provisions therein. Id.

Upon review of this language, the Supreme Court determined that "the collective-bargaining agreement in this case does not contain a clear and unmistakable waiver of the covered employees' rights to a judicial forum for federal claims of employment discrimination." Id. at 82. In reaching this decision, the Court noted that the agreement's "arbitration clause is very general, providing for arbitration of 'matters under dispute,' . . . which could be understood to mean matters in dispute under the contract." Id. at 80. Furthermore, "the remainder of the contract contains no explicit incorporation of statutory antidiscrimination requirements." Id.

In contrast to the facts in <u>Wright</u>, the collective bargaining agreement in <u>14 Penn Plaza</u> contained the following language, regarding the requirement to arbitrate claims of discrimination:

> There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability, national origin, sex, union membership, or any other characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the New York State Human Rights Law, the New York City Human Rights Code, . . . or any other similar laws, rules, or regulations. All such claims shall be subject to the grievance and arbitration procedures (Articles V and VI) as the sole and exclusive remedy for violations. Arbitrators shall apply appropriate law in rendering decisions based upon claims of discrimination.

<u>14 Penn Plaza</u>, 129 S. Ct. at 1461. Without discussion on this point, the Court concluded that this language "clearly and unmistakably requires union members to arbitrate claims arising under the Age Discrimination in Employment Act of 1967 (ADEA)." <u>Id.</u> at 1461, 1466.

This Court concludes that the CBA at issue, in the present litigation, is much more akin to the general contract language presented in <u>Wright</u> than the more specific language in <u>14 Penn Plaza</u>. Initially the Court notes that the CBA contains a general anti-discrimination provision, which is the clause to which the Defendants point, but (as the Plaintiffs note) this case involves a First Amendment retaliation claim, not a discrimination claim. Therefore, this provision is irrelevant to the issue at hand. Furthermore, as the Plaintiffs also point out, the agreement specifically omits such claims from the arbitration requirement, since such claims "may be

made a complaint with any Federal or State Agency," such as the Equal Employment Opportunity Commission or the Ohio Civil Rights Commission. In contrast to the explicit language regarding discrimination, the CBA contains no language regarding First Amendment retaliation claims or claims under § 1983, in general. In addition, although the agreement provides generally that "disciplinary actions" may only be "appealed" through the stated grievance and arbitration procedures, it goes on to provide that "grievances are limited to matters of interpretation or application of express provisions of this Agreement."

The noted language is too general to be considered "clear and unmistakable", as to a waiver of covered employees' rights to proceed judicially for claims such as the present one. As the Supreme Court noted in Wright, this Court "will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.'" Wright, 525 U.S. at 80 (quoting Metro. Edison Co. v. NLRB, 460 U.S. 693, 708, 103 S. Ct. 1467 (1983)).


Thus, the Court concludes that there are genuine issues of material fact as to whether Keith Sigler has established the elements of his *prima facie* case of First Amendment retaliation and, therefore, whether the Defendants are entitled to qualified immunity. Furthermore, the Court finds that the CBA does not bar Sigler's First Amendment retaliation claim. Therefore, the Defendants' Motion for

26

Summary Judgment (Doc. #59), as to the claim for First Amendment retaliation (Count I), is OVERRULED.


      B.    <u>Intentional Infliction of Emotional Distress (Count IV)</u>

As their remaining claim for relief, the Plaintiffs contend that the Defendants intentionally caused them emotional distress. Doc. #1 ¶¶ 81-85.  The Ohio Supreme Court has recognized that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." <u>Yeager v. Local Union 20, Teamsters</u>, 6 Ohio St. 3d 369, syl., 453 N.E.2d 666 (1983).  To maintain a claim for intentional infliction of emotional distress, a plaintiff must prove the following elements:

    (1)    [The defendants] intended to cause [her] emotional distress;

    (2)    [The defendants'] conduct was so extreme and outrageous as to exceed all bounds of decency and be utterly intolerable in a civilized society;

    (3)    [The defendants'] conduct was the proximate cause of [the plaintiff's] psychic injuries; and

    (4)    [The plaintiff's] mental anguish was such that no reasonable person could be expected to endure it.

<u>Dixon v. Northridge</u>, 2008 Ohio App. LEXIS 2301, *29, 2008 Ohio 2744 (Ohio 5th App. Dist. June 5, 2008) (citing <u>Ashcroft v. Mount Sinai Medical Center</u>, 68 Ohio App. 3d 359, 588 N.E. 2d 280 (Ohio 8th App. Dist. 1990)).

The Defendants contend that the Plaintiffs have not set forth evidence to demonstrate that the Defendants' alleged conduct was "extreme and outrageous" (prong two) or that the Plaintiffs' mental anguish was sufficiently extreme (prong four) to satisfy their burden. Alternatively, they argue that, as employees of a political subdivision, they are entitled to immunity for this claim, under Ohio Revised Code § 2744.03(A)(6). The Court need not consider the totality of the Defendants' arguments, however, given that it agrees that the Plaintiffs have not set forth any facts to satisfy the fourth element of their *prima facie* case.

The Ohio Supreme Court has instructed that "in order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious." <u>Yeager</u>, 6 Ohio St. 3d at 374. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" <u>Id.</u> at 375. Further, "[s]erious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." <u>Paugh v. Hanks</u>, 6 Ohio St. 3d 72, syl. ¶ 3a, 451 N.E.2d 759 (1983). The Court has also provided a "non-exhaustive litany of some examples of serious emotional distress," to wit: traumatically induced neurosis, psychosis, chronic depression and phobia. <u>Id.</u> at 72.

28

In the present case, the Plaintiffs set forth no evidence to demonstrate that they have suffered emotional injury that is both severe and debilitating. The only mention of mental anguish, in their brief, is an unsupported contention that "Plaintiffs have been treated for depression as a result of Keith's termination." Doc. #63 at 14.

The Plaintiffs, thus, have not set forth sufficient evidence to demonstrate the fourth prong of their *prima facie* case of intentional infliction of emotional distress. Therefore, the Defendants' Motion for Summary Judgment (Doc. #59), as to the Plaintiffs' claim for intentional infliction of emotional distress (Count IV), is SUSTAINED.


V.     Conclusion

The Defendants' Motion for Summary Judgment is SUSTAINED, as it pertains to the Plaintiffs' claims for intentional infliction of emotional distress (Count IV) and disability discrimination (Count VI), and is OVERRULED, as it pertains to the claim for First Amendment retaliation (Count I). Doc. #59. At this stage of the litigation, the only claim remaining is Keith Sigler's claim for First Amendment retaliation (Count 1).

The Defendants' Motion to Strike Exhibits (Doc. #71), is OVERRULED, as it pertains to the documents attached as Exhibit D to the Rutowski affidavit (Doc. #67), and OVERRULED, as moot, as to all other challenged evidence.

On Monday, September 14, 2009, at 8:50 a.m., the Court will convene a conference call with counsel of record to discuss further procedures in this case.

September 8, 2009

  /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record